LOWELL F. BUSHNELL AND DOROTHY C. BUSHNELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2264–65.    Filed December 29, 1967.

*Earl C. Crouter* and *B. H. Neblett*, for the petitioners.
*Marion Malone*, for the respondent.

300

302

OPINION

## I. *Re Issue 1*

The first issue to be decided requires answers to two related questions, to wit: Did the petitioner, during each of the 10 years involved, receive taxable income which he did not report in the joint income tax return filed by him and his wife? And (2), if he did, what are the amounts of such unreported income?

The answers to these questions are basic to the decision of all issues here involved—because the validity of all the deficiencies and other liabilities which the respondent determined in his notice of deficiencies, and also the validity of all the differing liabilities which he now claims

on the basis of a new and revised net worth computation, were and are predicated upon the existence of unreported taxable income. Moreover, the respondent who has the statutory burden of proving fraud cannot establish such fraud for any year in the absence of an income tax deficiency. And absent proof of fraud, the assessment and collection of any deficiency or addition to tax for any of the first 7 of the 10 years involved, would be barred by the statute of limitations.

Each of the two questions above-mentioned is factual, and must therefore be resolved from our consideration and weighing of all the pertinent evidence.

(A) *Determination of Petitioner's Receipts, by Specific Adjustments to His Returns.*—After having seen and heard all the witnesses testify, and after having considered and weighed all pertinent and material evidence of record, we are convinced: First, that the *best evidence* that there was unreported income for each year involved is petitioner's admission (made both to the examining revenue agents, and also in his testimony before this Court) that he did not include in his return for any of the pertinent years, those pre-child-delivery receipts from obstetrical cases which were recorded on his O.B. charts, but were not likewise recorded in the daily logs from which he prepared his income tax returns. And secondly, we are further convinced that the *best evidence* of the amounts of said unreported income is the record of the predelivery receipts shown on the O.B. charts—a summary of which, by years, was submitted by petitioner to the Internal Revenue Service through his accountant, and was received in evidence herein as Exhibit 32. The aggregate amount of such unreported income received for all 10 years was $90,320.68, as is shown both in our Findings of Facts and in our Findings of Ultimate Facts.

Without in any way condoning petitioner's omission of such obstetrical receipts from his returns (which we shall subsequently consider in deciding issues 2 and 4 pertaining to fraud) we are satisfied from all the evidence: (a) That the office records of petitioner, including his O.B. charts, were regularly and fairly maintained by petitioner's women employees in the regular course of the professional practice; (b) that these employees (three of whom testified—we believe credibly) not only handled the record-keeping, but also arranged the appointments, issued the bills, and both received and deposited substantially all the collections on account—which provided the basis for the several office records; and (c) that such office records, taken collectively, clearly and adequately reflect petitioner's professional income for all years here involved.

It is true that the examining agents did not actually see the entries on the O.B. charts; but the chart numbers (which were

consecutive), the names of the patients, the amounts of the receipts, and also the years of receipt, were all disclosed both to them and to other representatives of the Internal Revenue Service, in ample time for checking either with the patients or with bank records or otherwise, long prior to issuance of the notice of deficiency. Also, there is no indication that the credibility of petitioner's description and summary of the O.B. charts was at any time challenged. To the contrary, Special Agent Starner and Internal Revenue Agent Allan each testified that he believed petitioner was cooperating with him. No administrative subpoena for production of the charts was ever issued. And no request was ever made either to this Court or any other court for issuance or enforcement of a subpoena.

By reason of all the foregoing, we hold that in the recomputation of tax which is to be made herein in accordance with Rule 50, the amounts of professional receipts which petitioner reported in Schedule C of his income tax returns for the years involved, should be increased by those receipts from obstetrical cases which admittedly were not reported—the amounts of which have been set forth in our Findings of Ultimate Facts.

(B) *Rejection of Respondent's Net Worth Computations.*—Respondent's position regarding the *source* of the unreported income here involved, is consistent with the *source* which we have recognized in the preceding section of this opinion. This is shown in part III of respondent's argument on brief, wherein he stated: "Petitioner's unreported income had its source in prepaid O.B. fees that were not recorded on petitioner's books and records." And then, in what appears to be a clarification and enlargement of the meaning of said statement, he further said:

When a patient made an advance payment on her obstetrical fee, *the amount of payment was entered on the patient's medical history chart*, but was not entered on the daily logs. Petitioner acknowledged that prepaid O.B. fees were omitted from his income tax returns. Therefore, he had unreported income from that *source*. (Emphasis supplied.)

Indeed, in the instant case, there is no claim, determination, evidence, or contention respecting the existence of any unreported income other than the pre-child-delivery receipts which (as respondent has recognized in the above statements) were entered on the patient's medical history charts, but were not likewise entered in the daily logs. Thus, the problem here before us centers on the method for establishing *the amounts*, not the source, of such unreported income.

The respondent has attempted here to establish the amounts of the year-by-year unreported income by use of first one and

then another of two net worth computations.[3] The first of these was attached to the notice of deficiency as Exhibit A, and was used in determining all the liabilities set forth in said notice. A significant feature of said Exhibit A is that it purported to reflect (as is clearly shown in the attached statement to the notice of deficiency) *not* unreported *net income or taxable income*, but rather unreported "adjusted gross income." Hence, the respondent, in employing said computation, found it necessary to allow or adjust (as he did) the *itemized deductions* per returns, before he could arrive at the "net income" or "taxable income" used in the computation of the tax. The petitioners, in their petition to this Court, specifically assigned error both in respondent's use of said Exhibit A computation, and also in the amount of the opening net worth employed therein.

At the trial, respondent abandoned said Exhibit A computation by placing in evidence, "as a substitute," a new and revised net worth computation designated "Exhibit AA," which Revenue Agent Allan testified that he had prepared. This new computation was offered without prior notice to the petitioners, and without amendment to respondent's pleadings. And it embodied a different method for computing the tax—for the reason that whereas Exhibit A, as before stated, purported to reflect "adjusted gross income" against which *itemized deductions were expressly allowed* by the Commissioner in order to arrive at *net income or taxable income*, the new Exhibit AA purported to reflect net income or taxable income *directly*, and thereby provide a basis for computation of the tax without allowance of any deductions (including the itemized deductions previously allowed by the Commissioner in his notice of deficiency).

After having carefully considered each of said so-called net worth computations and all the testimony and other evidence pertaining thereto, it is our opinion and we here hold, as heretofore stated, that the best evidence of petitioner's unreported income is the record of the predelivery receipts as shown on petitioner's O.B. charts, the amounts of which for each year are set forth in our findings of fact. Respondent had the burden of showing that the various items and figures contained in his revised computation, designated Exhibit AA, were correct; and he has failed to meet such burden.

In *Holland* v. *United States*, 348 U.S. 121, the Supreme Court pointed out many of the dangers and pitfalls inherent in attempting to determine taxable income by use of net worth computations. It recognized that the technique thereof "is not a method of accounting

---

[3] Both of the above-mentioned net worth computations are being incorporated herein by reference, without reproduction, because of their size and extensive outlay of figures covering all 10 years from 1949 through 1958.

at all"; but rather is a method for approximating the receipt of income, through use of circumstantial evidence, assumptions, and inferences. It is true that resort to such an extraordinary method is sometimes essential for tax enforcement, particularly in situations where there are no records, or clearly inadequate records; and also that its use may be permissible for *testing* the accuracy and reliability of the taxpayers' books and records. But this does not mean that where, as in the instant case, there is credible evidence that adequate books and records were regularly and accurately maintained (even though all of them were not given effect in the returns) the normal method of adjusting specific items of the returns should be replaced in favor of approximation, assumption, and inference. The Supreme Court emphasized in the *Holland* case that there also are certain conditions which must be met (and which we believe must be met by the proponent) before use of a net worth method is justified, including: The establishment of an opening net worth; the elimination of nontaxable items by adequate investigation of leads; and proof of likely sources for any alleged unreported income. The Supreme Court also stressed the necessity for exercising care and restraint in applying the net worth method, and for keeping in mind the specific facts in individual cases.

It is true that *Holland* was a criminal case; but the general principles enunciated therein have been regarded both by this and other courts, as guidelines which may be used also in *civil* net worth cases. Moreover, even before the *Holland* decision, this Court recognized similar principles in *Thomas A. Talley*, 20 T.C. 715; and it therein rejected the Government's employment of the net worth method, on the ground that the taxpayer's books and records were "sufficiently accurate and complete for the computation of income." See also *Lenske* v. *United States*, 383 F. 2d 20, (C.A. 9, 1967), in which the Government's net worth computation was rejected for failure of proof; and see further, the two cases, *West* v. *Henslee*, an unreported case (D. Tenn. 1957, 52 A.F.T.R. 1828, 57-2 U.S.T.C. par. 9932), and *Ragsdale* v. *Paschal*, 118 F. Supp. 280 (E.D. Ark.)— in each of which the use of the net worth method was rejected for reasons similar to those in *Thomas A. Talley, supra*.

Applying the foregoing principles in the instant case, we deem it sufficient to point out that we have heretofore held on the basis of the evidence: That the office records of petitioner, including his O.B. charts, were regularly and fairly maintained by his women employees in the regular course of his professional practice; and that these records, taken collectively, are sufficient to clearly reflect petitioner's professional income for all years involved.

Moreover, one of the conditions essential to use of the net worth method, which as before stated was pointed out in the *Holland* case, is the establishment of an *opening net worth*. This is necessary, not only to serve as the starting point from which to calculate future increases in net worth; but also to support the basic assumption of the net worth method, that all such increases—and also all nondeductible personal expenditures—represent income realized in the particular year involved, rather than income realized in some period prior to the opening year of the net-worth computation. The Supreme Court said: "the correctness of the result depends entirely upon the inclusion in this sum [the opening net worth] of all assets on hand at the outset."

In the instant case, the opening net worth of the computation upon which respondent now relies (Exhibit AA) has not been adequately established. The prior computation (Exhibit A) which the Commissioner used in his notice of deficiency, included an opening net worth of $1,380.63 (and even the accuracy of this amount was challenged by petitioners in their pleading). But in the substituted computation prepared by Revenue Agent Allan which was placed in evidence at the trial, the respondent employed an opening net worth of *zero*—notwithstanding that petitioner had received salaries of from $10,000 to $18,000 from the Branch Clinic during each of the 3 years preceding the opening year. During cross-examination, the revenue agent conceded that his attemps to defend such zero figure were based on "just speculating and surmising."

Furthermore, in Exhibit AA the aggregate of the stated net worth increases for all 10 years involved, is *less* than the total amount of unreported income which we have found on the basis of petitioner's admissions and accounting records. Therefore, the reason that the concluding figures of respondent's computation purport to reflect aggregate unreported income in an amount *greater* than we have found, is that respondent has included in nondeductible "Personal Expenditures," a large number of items which petitioner contends were actually *professional* expenses for which he had claimed deductions on his return, and which the Commissioner did not specifically disallow either in whole or in part, in the notice of the deficiency.

After considering all the evidence, we are satisfied that respondent has not established that all the items which he has treated as being *nondeductible* personal expenditures, were properly so classified.

(C) *Disapproval of Certain Deductions Claimed by Petitioner.*— The respondent in his notice of deficiency expressly allowed, as heretofore mentioned, certain itemized deductions from the determined adjusted gross income; but he did not expressly disallow, either in whole or in part, any of the deductions which petitioner claimed for professional expenses.

However, after considering and weighing all evidence adduced at the trial concerning the deductibility of certain disputed expenditures, and also after considering various statements and concessions of the parties on brief; it is our opinion and we here hold that no deduction shall be allowed to petitioners for any year in respect of any of the following:

Claimed expenses for repair of sprinkler at petitioners' Pasadena residence.

Claimed casualty losses for storm damage to trees at residence.

Claimed expenses for wages, room and board for telephone operators at residence.

Claimed expenses for entertainment at residence.

Claimed expenses for office at residence.

All adjustments resulting from our above holding as to issue I, will be made in the computation under Rule 50.

## II. *Re Issue 2*

The second issue presents the question of whether at least part of the deficiency for each of the years involved is due to fraud with intent to evade tax. After considering and weighing all the evidence of record, we feel impelled to decide—and we do here decide—this issue in the affirmative.

As indicated in our findings of fact, the evidence establishes that petitioner is an intelligent and well-educated individual who established and maintained his own professional office, and who specialized during all years in gynecology and obstetrics. During his practice of the last-mentioned specialty, he personally conferred with expectant parents regarding the amounts of his fees; arranged for the manner of the payment thereof; and caused the receipts of all such fees up to the time of child delivery, to be recorded on O.B. charts through use of a code system which he created. Also, in situations where the entire obstetrical fee was not paid prior to child delivery or where additional fees were charged for subsequent services, he caused a new account (usually entitled "O.B. Balance") to be established in the name of the patient in both his daily log and ledger—where it not only provided a place for recording subsequent obstetrical receipts; but where it also must have provided a reminder to petitioner when he prepared his income tax returns on the basis of those books of account, that there were prior receipts which had been recorded only on the O.B. charts.

In these circumstances, it is inconceivable to us that petitioner's omission, from each and all of his income tax returns for the entire period from 1949 through 1958, of all predelivery receipts in obstetrical cases (which represented one of his two professional specialties) could

have resulted from any cause other than willful intent to evade income tax. Mere negligence or oversight may from time to time cause omission of particular items; but that is not the situation here. No adequate excuse for the omissions has been presented or suggested.

We decide this issue 2 in favor of the respondent.

### III. *Re Issue 3*

The third issue involves the imposition of additions to tax under section 294(d)(2) of the 1939 Code, for substantial underestimation of estimated income taxes. Such impositions, if proper, are largely automatic and depend principally on the relationship between the amounts of tax estimated and the amounts of tax due.

Based on the evidence before us, we have hereinbefore found as an ultimate fact and we here hold, that there was a substantial underestimate of estimated income tax by petitioner and his wife for each of the years 1950 through 1954. The amounts of the liabilities under this issue will be reflected in the computations to be made under Rule 50.

### IV. *Re Issue 4*

This fourth issue is whether assessment and collection of any deficiencies and additions to tax for the several years involved are barred by the statute of limitations.

We have hereinabove found as a fact that, at the time the notice of deficiency was issued, waivers or consents to extension of the periods of limitation were outstanding only for the years 1956, 1957, and 1958. However, section 276 (a) of the 1939 Code and section 6501 (c) of the 1954 Code provide, in substance, that in the case of a false or fraudulent return the tax may be assessed, or proceedings in court for collection may be begun without assessment, at any time.

Based on reasons stated in respect to issue 2, we have heretofore found as an ultimate fact and we here hold: That the income tax return filed by or on behalf of petitioner and his wife for each of the years 1949 through 1958 was and is false and fraudulent with intent to evade tax; and that therefore the assessment and collection of any income tax liabilities for any of said years are not barred by the statute of limitations.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

RAUM, *J.*, concurring: I am willing to accept the trial judge's factual conclusion that upon the basis of the testimony and voluminous evidence before him the books and records in the peculiar circumstances of this case provide a more accurate measure of the taxpayer's income than does the particular net worth statement relied upon by the

Government. That can and should end the matter. But the prevailing opinion contains further discussion, not necessary to the disposition of the case, which I think is founded upon incorrect principles of law.

Thus, the opinion places reliance upon *Thomas A. Talley*, 20 T.C. 715, which appears to hold that by reason of section 41 of the 1939 Code the Commissioner is without authority to use the net worth method where the method of accounting employed by the taxpayer clearly reflects income. The fallacy of this theory has since been exposed. The net worth method is not a method of accounting at all. When properly employed, it is merely evidence of unreported income, and there is no rule that prohibits its use merely because the taxpayer keeps books utilizing a system of accounting that is capable of accurately reflecting income. This was plainly articulated in *Holland* v. *United States*, 348 U.S. 121, 132, where it was pointed out that even where no specific false entries are detected, the books may nevertheless be "more consistent than truthful." This view has been repeatedly expressed in one form or another in a large number of cases, of which the following are but random samples: *Morris Lipsitz*, 21 T.C. 917, 931, affirmed 220 F. 2d 871 (C.A. 4), certiorari denied 350 U.S. 845; *Estate of W. D. Bartlett*, 22 T.C. 1228, 1230; *Estate of George L. Cury*, 23 T.C. 305, 333–334; *Davis* v. *Commissioner*, 239 F. 2d 187, 189 (C.A. 7), affirming a Memorandum Opinion of this Court, certiorari denied 353 U.S. 984; *Schwarzkopf* v. *Commissioners*, 246 F. 2d 731, 733 (C.A. 3), affirming a Memorandum Opinion of this Court.

The theory of the *Talley* case has been thoroughly discredited, and I do not believe that a majority of the Court today approves it, if indeed it is approved by a single member of the Court other than the author of the prevailing opinion. This concurring opinion is therefore being filed so that the bar may not be misled into concluding that new life is now being breathed into *Talley*.

TIETJENS, ATKINS, FORRESTER, FAY, DAWSON, TANNENWALD, SIMPSON, and FEATHERSTON, *JJ.*, agree with this concurring opinion.

DAWSON, *J.*, concurring: I agree with the result reached by Judge Pierce in this case. It may well be that he is entitled to rely on the petitioner's records as the *best evidence* of unreported income in these circumstances. However, I cannot subscribe to some of the statements expressed by him under the heading "Rejection of Respondent's Net Worth Computations" which appear on pages 21 to 28 of his opinion. The *Holland* case does not stand for the proposition that if a taxpayer's books and records are adequate, the net worth method may not be used by the Commissioner. In fact, a number of cases clearly support the view that the net worth method of reconstructing income may be used to test the accuracy and adequacy of a taxpayer's books

and records regardless of whether they are on their face adequate or inadequate. See *Schwarzkopf* v. *Commissioner*, 246 F. 2d 731 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; *Davis* v. *Commissioner*, 239 F. 2d 187 (C.A. 7, 1956), affirming a Memorandum Opinion of this Court, certiorari denied 353 U.S. 984 (1957) ; *Vloutis* v. *United States*, 219 F. 2d 782 (C.A. 5, 1955) ; and *Morris Lipsitz*, 21 T.C. 917 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955.) Certainly the attempted use of the net worth computations by respondent does not shift to respondent the burden of proving the basic deficiencies. That burden still remains on the petitioners.

I also disagree with Judge Pierce's reliance on *Thomas A. Talley*, 20 T.C. 715 (1953), a pre-*Holland* opinion which has been sapped of its vitality by *Holland* and subsequent decisions.

DRENNEN, ATKINS, FAY, HOYT, TANNENWALD, and FEATHERSTON, *JJ.*, agree with this concurring opinion.

---

SCOTT, *J.*, dissenting: The majority opinion concludes that "the problem here before us centers on the method for establishing *the amounts*, not the source of such unreported income." In my view the question is not one of "method" but is whether petitioners have shown that the determination of respondent is erroneous. The fact that respondent has determined the tax liability of a taxpayer by the net worth method does not relieve that taxpayer of showing error in respondent's determination. *Estate of W. D. Bartlett*, 22 T.C. 1228, 1232 (1954). In my view the majority opinion places on respondent not only the burden of establishing fraud by clear and convincing evidence but also the burden of establishing petitioners' tax liability.

I also disagree with the reliance in the majority opinion on *Thomas A. Talley*, 20 T.C. 715 (1953), for the proposition that respondent's use of the net worth method must be rejected where "the taxpayer's books and records were 'sufficiently accurate and complete for the computation of income.' " This Court has pointed out in a number of cases that the net worth method is not a method of accounting but rather is a way of showing that the income disclosed on the taxpayer's return is incorrect. *Estate of George L. Cury*, 23 T.C. 305, 333 (1954). The net worth method may be used where a taxpayer's books are too incomplete to permit any computation of income therefrom or as evidence to show that books which appear to be accurately kept are not in fact an accurate record of a taxpayer's income. *H. A. Hurley*, 22 T.C. 1256, 1261 (1954), affd. 233 F. 2d 177 (C.A. 6, 1956).

I have not reviewed the entire record in this case and would accept the opinion of the trial judge as to whether the evidence produced by

petitioners was sufficient to overcome the presumption of correctness of respondent's determination and whether the preponderance of the evidence of record showed a tax liability in an amount less than that determined by respondent if the majority opinion dealt with these questions. If the intended holding of the majority opinion was that of the basis of all the evidence of record petitioners' tax liability was less than the amount determined by respondent, it does not precisely so state. The opinion does contain statements which might be interpreted to place the burden of proof of the tax liability as well as of fraud on respondent, and, therefore, I respectfully dissent.

WITHEY, *J.*, agrees with this dissent.